The next case is On Re. ACTOS Antitrust Litigation. Good morning, Your Honors. Steve Reed on behalf of Appellant Takeda. May it please the Court. Your Honors, this is an interlocutory appeal in two related cases before Judge Abrams in the Southern District of New York. The only remaining theory of liability in those two cases is that Takeda wrongly described two of its patents, the 584 patent and 404 patent, as drug product patents in the FDA's Orange Book with respect to Takeda's diabetes drug, ACTOS. The threshold question raised in Takeda's motion to dismiss was whether Takeda's patent listings were appropriate. That required an interpretation of the statute, which the District Court acknowledged was a matter of first impression. The issue before Your Honor, the standard of view in this Court, is de novo. In order to understand the issues, I think it's important to start first with the actual language at issue, the statutory language. That's found at 21 U.S.C. 355 B.1. That statute provision sets forth the requirements for listing patents in the FDA's Orange Book. It requires that new drug applicants list, quote, any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted. We'll talk about this a fair amount this morning. There's two pieces, two components to that requirement. One is that the patent has to be either a drug product patent or a method of use patent with respect to the drug at issue. And the second, which I'll refer to as the infringement modifier, is that with respect to those claims, there has to be a patent infringement claim that could reasonably be asserted.  These are not optional. This is not optional. If patents meet these requirements, they are required to be listed in the FDA's Orange Book. If a patent is listed in the Orange Book, the manufacturer must comply with the regulations, the FDA regulations, which prescribe what information must be must be provided about those listed patents. And among the information, you can find those requirements at 21 CFR 314.53C. And among the requirements that manufacturers must satisfy is that they must include a description of the type of patent that is being listed, i.e., and this is from the regulation itself, i.e., drug, comma, drug product, comma, method of use. And that description is also mandatory. This is not optional. Now, I think the court has recognized, and certainly the Supreme Court has time and again, that when interpreting a statute, you must consider context, which means you look at the words in the statute. The court's also been very clear, and this court has recognized, that you must consider the meeting in the context of the overall statutory goal. And here, I think that's a really important point to focus on here because the entire purpose of the listing provision, the reason that the Orange Book exists in the first place, is for brand manufacturers to identify patents that may become a bar to a generic launching a competing product before those patents expire. And the goal here is to identify those patents. Hatch-Waxman represents a departure from traditional patent law, where you don't bring a patent infringement action until there has been an active infringement. This accelerates that analysis so that patents can be challenged before a generic has been launched and before generic companies face potentially crippling damage remedies, if they launch a product that ultimately is determined to be infringed. So this is something that benefits. Can I ask a question just at the start? Because you said we focus on the context of the provision and looking at the language. Am I correct in understanding that the phrase claims the drug or claims a method of using such drug, has a specialized meaning within the patent bar, would mean a particular thing in patent law. And when looking at the context suggests the use of that, those two phrases would invoke that specialized meaning both times they're used. Your Honor, you're correct that the term claims when used in connection with a patent can have can be a term of art for certain purposes. So, for example, in a Markman hearing where you're seeking to construe what the claim, the scope of the claims in the patent. But it's also clear that that claims does not have an immutable definition. And actually, the Federal Circuit's decision in Hoche, which is a case on which the plaintiffs rely, actually recognize that principle almost explicitly there. Hoche is the case that the plaintiffs like because it was construing a different part of the statute where there was a reference to claims, but not infringement. And the court there, the Federal Circuit there, has applied what they what the plaintiffs call the plain meaning or the or the term of art definition of claims. But interestingly, Your Honor, one of the one of the things and this is this is very clear in the Federal Circuit's decision. And it's also something that the district court below picked up on. What the Federal Circuit said was, well, it's meaningful that the word infringement doesn't show up in this statute. And then the Federal Circuit went on to give an example of of where the term claims would have a different meaning. And the example they gave was where the statute actually used the word infringement, talked about infringement. Well, that's exactly what we have here, Your Honor. And so I think even the Federal Circuit has recognized. And that's the court charged with with focusing on principally on patent law issues that the term claims, even when used in connection with a patent, does not have a single meaning, but must be read in context. I guess I guess I get that. And my follow up question would be, I mean, there's three uses of claim, the word claim and the statute. And I agree when you say claim of patent infringement, that would not. That doesn't seem to me to invoke the specialized meaning we're talking about. But when you look at the patent, which claims something. Right. When that phrase is used, it doesn't. But what is the patent claim? And and I don't see unless I'm misunderstanding and I'm looking forward to hearing the rest of your argument and all the other arguments. I'm I'm. But my starting point would be we would use that specialized meaning for that phrase. The first two places the word claims appears in the statute. Sure. So so your honor, to be precise, the word claims appears twice as a verb. It's a verb as something that the patent does. And then the third word, third, third usage is claim singular. And that's the noun. Right. A claim could be brought. Got it. So the focus here is on on the two uses of the of the verb claims. And the question is, and frankly, this is where the district court got confused and committed error. And this is maybe I won't say it's unique, but it's the unusual situation where all the parties before you have admitted that the district court committed error. The district court's interpretation was wrong. We differ about how it got it wrong. But we all agree that it needs to be corrected. The basis for the district court's interpretation was its erroneous conclusion that that infringement modifier only modified the method of use patents and not the drug product patents. We know that we now know that that is wrong. First of all, it's wrong just as a matter of basic grammar and construction. Actually, there was a recent decision, the Facebook decision of the Supreme Court just Thursday, where the court talked about the series qualifier canon, which I admit that phrase is new to me. But the but the Supreme Court described it as this, quote, when there's a straightforward parallel construction that involves all nouns or verbs in a series. A modifier at the end of the list normally applies to the entire series. So I think as a matter of grammar and plain construction, the modifier has to apply to both types of patents. The plaintiffs also admit they concede that the modifier applies to both types of patents. We just disagree about what that means. The FDA regulations that we've cited in our papers make it clear that the FDA views that modifier as applying to both types of patents. And frankly, the new the amendment to the act, which was the subject of plaintiff's 20 J letter last week, also makes it clear that language now couldn't be clear that that modifier applies to both types of patents. But that, of course, doesn't mean that we shouldn't that the district court wasn't correct in her understanding of the context and the general purpose of of the of this statute. And looking, as Judge Livingston did at the phrase, any patent which claims the drug for which the applicant submitted the application. So we have the addition of the new drug drug application and the patent language and the overall purpose, which I understand it was to allow a limited time of exclusivity and then a period in which generics are entitled to come in and to compete. And that being the overall purpose, it seems to me that provides another reason for adopting the patent understanding of the word claims the drug for which the applicants submitted the application. And and to look at the drug and differentiate that from a the drug substance, which would have been the 777 patent differentiate that from a drug product for or for the combination of the active ingredient with the second active ingredient. However, you pronounce it. So I'm looking to the text as well as the context to suggest that the narrower understanding, which maybe the district court got to in a way that no party is willing to defend now. And that wasn't the industry understanding. Nonetheless, the narrower understanding is the correct one. Am I am I wrong in some aspect of that understanding? So, Your Honor, I agree with you to a point, but I but but there's areas where I would elaborate. So, first of all, there's no disagreement that when when there's a reference to the drug, the references to the NBA drug. So in this case, Actos, the question is whether this drug product patent, there's no dispute that it's a drug product patent. The question is, does it claim Actos within the meaning of the listing provision? I disagree. I agree with you that context matters and that and that you need to look at the purpose of the statute. But I would argue that the purpose of the statute is broader than what you described. And I think I think that we've cited authorities to support this position. Generics would like to know what patents or potential impediments to their ability to launch. And so they actually favor. We've submitted papers. Authority on their citations to this point. It advances the goals of Hatch Waxman to identify those patents so that they can be tested to avoid costly disruption of the market down the road. So so so so when the citizen petitions filed, how is the purpose of the statute forwarded? If if the representation is, is that Actos, the the patent for Actos is a drug patent. It applies to drug itself as opposed to the method of use of Actos. How is that? How's the purpose of the statute advance? A, the patents expired. B, it's only used in the cut. The the the invention is the synergy between Actos and another substance. And the purpose for carve outs is to ensure that they don't do those those method of uses that they're only going to replicate Actos. So I don't understand how misrepresenting the this is the plaintiff's theory, how answering when the citizen petition is that these other two patents imply drug use for Actos. When is it your view that you'd have a patent claim for Actos if someone made a generic with regard to either those other method of uses or those other two substances that are covered by those other patents? But Judge Wesley, it's not only my view, but it was Judge Coates view in a case where this was litigated. This is a claim for indirect infringement, not direct infringement. A claim of infringement could be brought against a generic proposing to sell pioglitazone as a monotherapy based on an induced infringement. A claim, a claim of an infringement of the Actos patent 777. Your Honor, no, forgive me. I misspoke. Isn't that the point? What they wanted to do was they wanted to produce a substance that mimicked the 777 patent. And you said or your client said, put pursuant to a citizen petition, that when Actos is used in something else, that implies the Actos patent, the drug use, the drug substance. And that's their whole claim is that that was a misrepresentation. So, so your Honor, we may be talking past each other and it's my fault. I apologize. So the 777 patent covered pioglitazone, which was the active ingredient in Actos that expired. The 404 and the 584 were added to the Orange Book with respect to Actos because they also claim a combination product that includes pioglitazone. Pioglitazone was the active ingredient in Actos. It was an active ingredient in the combination product. So let me stop you right there. I want to create a generic for pioglitazone. I don't want to have it interact with anything else. I want to do a generic on that. Can I do that? And do I violate the Actos patent? Your Honor, then becomes the fact question, which Judge Cote wrestled with, which is whether there were facts sufficient to support. Wait a second. Hadn't your patent in Actos expired in 2011? So the 777 on pioglitazone expired, correct. So if I want to just do a generic on pioglitazone, then am I right that I can go ahead and do that? And isn't that what the carve-out is for? I carve out and I say I'm not going to do anything that involves interaction with these other two patents. I'm not going to do that. That's what the carve-out is for. All I'm going to do is a generic for pioglitazone. That's what the citizen petition was all about, was asking for that. And the response was, no, these two patents imply the intellectual property with regard to pioglitazone. So, Your Honor, again, I think the 777 patent was expired. The company didn't have the ability to assert the 777 patent. The question is whether these other two patents claimed the drug within the meaning of the statute. Part of that interpretation, and I would love to give you what I think is the proper articulation of the standard here, but the conclusion was that because those patents included claims which included pioglitazone, and because they could be infringed, a claim for infringement could reasonably be asserted, as Judge Cote held, they were required, not permitted, but required to be listed in the Orange Book. I understand that. I don't disagree with you about that. I think that's fair. But the question is how you characterize them. Well, how you describe them, right? That's where the regulations say if it's a drug product patent, you have to identify it as a drug product patent. And these have drug product claims. You're in essence writing the ability to carve-out out of the statute. Well, Your Honor, I think, again, there's two decision points here, too. The listing requirement is mandatory. In fact, the plaintiffs concede that these patents were required to be listed. What the company does with that listing, there are two steps here, right? If a company certifies against those patents, Takeda has a decision to make whether it has a good faith basis to assert a claim of infringement. That will decide on the facts. I'll give you the Sandoz case that we cite where Takeda sued Sandoz. Sandoz moved to dismiss those claims of infringement of the 584 and 404. And Judge Coates said no, that Takeda had stated a claim. And that's exactly, those are the kinds of claims that I would submit were intended to be smoked out and addressed before generic launch. That's the purpose of the listing provision. If I could, Your Honor, I know I'm well over time, but I think it's important to articulate the standard that I think applies, that Takeda believes applies. So, and really, this is consistent with what we believe is the purpose of the Hatch-Waxman Act. It's easily administered, and it would provide clarity to the industry in this very important issue. Claims and the infringement modifier in the listing provision must be read in tandem. They both have to be given meaning. And each of those terms, each of those requirements contains a limiting principle. It's important to understand that. Not all patents that would be infringed under the modifier are required to be listed. Congress made a choice. Congress struck the balance by saying only certain types of claims, drug substance, drug product, and method of use patents have to be listed. We qualify. But importantly, not all drug products that could be infringed are required to be listed either. This gives meaning to the term claims. Only those drug patents that claim the NDA drug, as here, where pioglitazone is a critical component of the combination product and is specifically referenced in claim one of each of those two patents, that, in our view, claims the drug for purposes of this statute when read in tandem with the infringement modifier. Now, contrast, Your Honors, if you would, the patent issue in the Atlantis decision. The First Circuit came out differently in Atlantis. But what they had there was the company had listed a patent that didn't even reference the NDA drug edition. It was in the Orange Book for an NDA drug, and this is at 950F3rd, page 7. The 864 patent does not even mention, much less claim, either insulin glargine or any method of using it, and that was the NDA product. The product was the insulin glargine. The patent at issue was for a drive mechanism that was used in a disposable injector pen device that was not drug-specific at all and was sold for injecting multiple different drugs. So, I mean, I think that's the bright line if you're looking for a bright line. I don't know that you need to describe the out-of-bounds here, but in a case like this one, where the actual drug at issue, pioblitazone, is specifically in the claim of the patent that's been listed, and at least one court in the Southern District has concluded that a claim of infringement could reasonably be asserted, from Takeda's interpretation, it's required to be listed. And there's consequences if it fails to list, right? I mean, we're dealing with an antitrust claim seeking to pose penalties for listing, but there are also antitrust claims out there against companies who fail to list patents. So, am I understanding your argument, then, that if you're saying that the listing of the 584 patent and the 404 patent, if we give the patent law sense to the phrase claims the drug, they would be required to be listed? I mean, I started by asking, should we give the specialized meaning to that phrase? Is it your position that the specialized meaning would require those two patents to be listed because they are patents which claim the drug? So, I think, no. Your Honor, the plan's position is that only patents that literally claim on every element of the drug would qualify. And as we argue, I mean, that is an overly restrictive definition. It ignores the reference to infringement in the statute. It ignores the example that the Federal Circuit gave in Hoche. It ignores the very reason why there's this listing requirement in the first place. There also, Your Honor, the plaintiffs are inconsistent. There's a fatal inconsistency in their argument. If you applied that very narrow definition of claims, the method of use patents, then those method of use patents shouldn't have been listed either. I mean, if you look at the way they describe what the method of use claims do, this is the direct purchaser's brief of 17. They say the patents also claim methods of using the respective combinations in the treatment of diabetes. And the end-payer brief has the exact same language. Well, if they're claiming methods of using the combination, then they don't literally claim the ACTOs either. Yet, the plaintiffs have conceded that they were properly listed in the Orange Book for ACTOs. So, I don't know how they can reconcile that. And in the end, their definition or their standard doesn't give any meaning to the infringement modifier, which is contrary to pretty straightforward principles of statutory interpretation. Thank you, Mr. Reed. Thank you, Your Honor. We'll hear from Appleese. Morning, Your Honor. Steve Shadowin on behalf of the end-payer plaintiffs. We're here on a motion, a review of a motion to dismiss a complaint. The complaint alleges that Takeda erected entry barriers, statutory entry barriers, to generic entry by falsely describing the two combination patents to the FDA in 1999 and 2000 and then reiterating those false descriptions to the FDA in connection with the citizens petition in 2010. And, Judge Wesley, you've essentially hit the nail on the head here. What Takeda was up to, what the complaint alleges Takeda was up to, was that it had the 7-7 patent that gave it what the Hatch-Waxman Act intended to give, 30-month stays to keep the generics out of the market, an inability of generics to carve out uses and get around the 30-month stays and the other entry barriers that way, and the 180-day roadblock that is erected when the first filers settle. The second filers then are backed up behind the first filers. All those things Takeda was entitled to get and they got in connection with the 7-7 patent. What this scheme, we allege, had to do with was getting it all over again, getting an additional round of 30-month stays, keeping generics from carving out exactly, this is exactly what Congress wanted to have happen, was when the composition patent, the patent that really did claim the drug, expired, then brand manufacturers could not then use what we call secondary patents, these method of use patents, to nevertheless continue the drug patent monopoly beyond the expiration of the composition through claiming methods of use. And so Takeda gets a great idea. Oh, gee, if we call these method of use patents, when the 7-7 patent expires, generics will be able to carve out the methods of use and they'll flood into the market because the generics will ask for a label that says use this in monotherapy and carve out the methods of use to say, and also use it together with an insulin secretion enhancer or a biguanide or what have you. That could happen. And to prevent that happening, Takeda took what are clearly method of use patents with respect to the use of Actos and labeled them to the FDA. And back in 1999, 2000, again in 2010, when specifically called on it, they reiterated it by saying, no, they're drug product patents that claim Actos. And therefore, they get all the goodies again. 30-month stays, inability to carve out, 180-day roadblock. So I want to address a few things. That makes sense as a theory of what could be going on here. Nonetheless, the statute does say, and I gather no one is defending the district court's reading, but the statute does say any patent that claims the drug for which the applicant submitted the application as to which a claim of patent infringement could reasonably be asserted. And what I understand is that your adversary is saying, listen, the combination use, both as a method of use as well as a drug product, is a use as to which a claim of infringement could reasonably be asserted because it involves the adoption and utilization of Actos. And the purpose here is to identify for the benefit of the generics all possible bases for infringement claims. So what's the flaw in their approach, if I'm getting it right? With respect, Your Honor, you did not get it right. Your description of what the statute says elided the key word, or one of the key words, the word and. Opposing counsel continues to refer to the requirement that the patent support a reasonable claim of patent infringement as modifying the first requirement, which is that the patent claim the drug. It doesn't modify. The statute says it has to do two separate things. The patents must claim the drug product and support a reasonable claim of infringement. And the FDA, going back to the 1990s, and we cite in our brief, they review this whole mess in 2003. And in connection with it, they say it's been our longstanding interpretation that this is two separate requirements. If they were here, they would say to opposing counsel, it's not a modifier. When we say that she is tall and she's intelligent, intelligent doesn't modify tall. Tall doesn't modify intelligent. She's two different things. And that's the point that the court made in the federal circuit. They said claim and infringement are two separate things. And opposing counsel said that Herxt gave an example in which Congress, they said if Congress wanted to engraft a modifier of infringement onto claim, they could have written the statute in a particular way. And counsel said that the Herxt example used the term infringement in the hypothetical statute that Congress could have used. That's not what they did. They didn't just use the term. They defined the other, the hypothetical statute that Congress could have written but did not in the Herxt case, defined claim by reference to infringement. They essentially gave the language that the court, with respect, started your question. Without the end, the example was Congress could write a statute that says if it claims a drug product with respect to which a reasonable claim of infringement could be brought. That's not what Congress did. They didn't smush them together. They said there are two separate requirements. The Herxt court says going back to 1836, the first patent statute, when where I'm sitting today was Mexico instead of Texas. In 1836, since that time, it's been understood in the patent law that claim and infringement are two separate things. And here we are with a statute talked about using a term of art. This is a statute where Congress is dealing with what patents need to be listed. And Congress uses a patent term of art. So it's absolutely clear, Isabel, that that gets, that that interpretation gets, that Congress is presumed to use the patent term of art the way it's used in patent law since 1836. So that's one thing I wanted to clear up, that the council continually refers to modifying. It even said that the plaintiffs admit that the second clause modifies the first with respect to method of use claims. That's not so. We absolutely do not admit that it modifies. They are two separate requirements. That's why the and is in there. And the FDA says these are two separate requirements, and that that's been our longstanding interpretation. I also want to respond to counsel's invocation of Judge Coates' decision in the Sandoz case. And he says in a very lawyer-like way that she denied a motion to dismiss the claims there because there could be a claim, a claim of induced infringement. That's exactly what she held. But with one modifier there, she held that there could be a claim of induced infringement with respect to the method of use claims, not to the drug product claims. She said there could be a claim of induced infringement with respect to the method of use claims. Also, counsel also said a ruling in his favor is needed to give clarity, clarity to the industry. There are 145 approved drug combinations by the FDA out there today, 145 combination drug products. And we basically challenged them in our brief. We said cite one other person. Cite, give us an example of one other manufacturer that's done what your guy did here, where they listed a drug combination patent as claiming the individual ingredients. Nothing. In footnote 13 of their brief, they refer to a Gilead product called Genvoia. Genvoia is a combination product. It actually has four active ingredients. So, of course, that manufacturer listed a drug combination product in connection with that product. It's a drug combination product. And so I think that if I had to hit the highlights, it's the ones that the court itself has already hit. Number one. Could you address, the district court concluded, and correct me if I'm misremembering this, that the plain meaning of claims cannot, the specialized patent meaning of claims can't apply to both drug product claims and method of use claims. Am I right about that? You're right, Your Honor. And your adversary points to that as a discrepancy that disproves your approach to interpreting the statute. Could you address, and specifically says, you admit that you assert that these patents should properly be listed as method of use claims, and that undercuts your argument. Right. They were properly listed as method of use claims for Actos. They were not properly listed as drug product claims for Actos. And here's where the district court went wrong, and follow me on this. She noted what you have just noted, Your Honor, that we admit that these patents were properly listed as method of use claims for Actos. And she then reasoned backwards. Well, if you're saying that claims with respect to a drug product combination patent does not claim the individual ingredients, what do you do about the fact that doesn't the same reasoning then imply that these should not have been listed with respect to Actos? Unfortunately, this wasn't briefed or argued in front of the district court. No one took this position, but here's the answer. When you're looking at what a product claims, whether a patent properly claims something with respect to this drug, if you're looking at the product, then you look at the product itself with the ingredients in the product, a combination product. If you're looking to methods of use, you don't do that by looking at the physical product. You look at what we in the industry call the label, that package insert that comes with every prescription that you get. Because the FDA approves not only the product, it also approves the label. And when you look at the label with respect to Actos, this is the brand manufacturer. Of course, he's going to want the broadest possible coverage for what's called indications. Use this in the following way. The label says you can use Actos as monotherapy by itself, or you can use it together with an insulin secretion enhancer, a biguanide, all these other things. The label does that. And it also says you can use it alone, which is where the carve out comes in. As Judge Wesley points out, these generic manufacturers were going to come in and just say, here's a label that says use Actos alone, carving out the other uses. That's what Congress intended. But unfortunately, the label, it's in the district court record at ECF 120-3 on page 13 of the label. It's also made its way into the record on appeal in the first appeal in this court at Joint Appendix 90. And so you'll look at it and you'll see exactly what it's meant. So the claims means exactly the same thing. It defines as the invention. The label says use Actos alone, or you can use it together with these other things. The Actos label does. And so that's why it was properly listed, the patent was properly listed, because it claims those uses, those combination uses. I hope that's clear. I know these things get weird. Very helpful. All the time. You are used to this. And we'll hear from your colleague. Thank you, Your Honor. Thank you very much, Your Honor, and good morning, everyone. I'm Tom Sobel with Hoggins Berman Sobel Shapiro LLP for the direct purchasers. I'd like to address two overall things to try to get rid of perhaps some underbrush that may have crept in. I want to address the purpose of the listing statute and then how it is it gets treated. So there are two overall goals to Section 355B1. The first is to decide which patents need to be known by the industry about a drug that has been approved. And then the second question is, which drug claims are going to trigger the exclusivity provisions of Hatch-Waxman? Those exclusivity provisions being the right to an automatic patent lawsuit, the right to a 30-month stay, which is functionally an automatic two-and-a-half-year preliminary injunction preventing the company from coming to market, and also triggering the 180-day exclusivity for the first to file. Now, so the question is, it's a matter of congressional intent and language. The real issue here is, which patents does Congress want to allow an NDA holder to have an automatic patent stay and trigger these exclusivities, and which other kinds of patents, no, no, no, drug company, you have to go to the courts and bring a lawsuit at an appropriate time and obtain an injunction. And in that area, what Congress also was infinitely clear about is that only drug product claims, only when a patent claims the drug product do we want to allow the NDA holder to trigger these exclusivities. And however, if the patent… Can I interrupt you just for a second? Your Honor. So you're saying that method-of-use claims are different in kind and therefore are outside of the exclusivity mechanism of Hatch-Waxman, right? Exactly, Your Honor. Okay. And the Supreme Court case of Caracal will make that infinitely clear, where method-of-use claims do not trigger those incentives, excuse me, those exclusivities. Why? Because Congress wanted unpatented uses to be able to go forward, right? And so, or even a period, right? And so that is the big distinction that I think we need to understand. So then if we turn to the statutory language, the question is, and the Congress even sets this up, they say, well, there are claims for… A patent might either claim the drug product or it might claim a method-of-use. And when you're making your listing, you're going to have to make which of those things are clear. Now, let's turn the page to what these patents are. We reproduced in the appendix these at our appendix, AA89 is where they start. Both of these patents that we care about, we're not talking about the 777, which is the basic compound patent, right, that expires in 2011. The 584 and the 404 each have two kinds of claims. Each has two independent claims. One independent claim with respect to combining Actos with another anti-diabetes agent. And another independent claim regarding how you can use Actos with respect to in combination. And our position, as is infinitely clear from Congress, is that when you take a look at the Actos NDA, for these two patents, what are you allowed to describe to the FDA about what those patents are? Well, each of those patents do not claim the product Actos. They claim a combination product. And if anything is clear in patent law, a combination claim does not claim each of the components, the specialized meaning of claim. The patents, however, do fairly describe a method of using Actos, and therefore were to be described by Takeda back in 1999 and again in 2002 as being method of use patents only with respect to Actos. And we say had that occurred, there would have been carve-outs and you would have seen products on the market a couple of years earlier. Now, just a couple of other brief points then as to what's been said here today. Mr. Reid ably, but I think incorrectly argues, that the appropriate interpretation of claims under 355B1 should not be the word claims, but mentions. If the ingredient is mentioned in the claim, he says it's claimed. Well, two things about that. First, not only does that not pass the specialized patent meaning, it doesn't pass any meaning of the word claims. Claims means that you're laying ownership to something, when you're using obviously in the sense of the verb, right? Well, mentioning something doesn't mean you're laying ownership over anything. And the second thing and the most more important thing is, if you were to adopt Mr. Reid's interpretation, then if a claim in a patent simply mentions an ingredient, then you have obliterated the distinction between drug product and method of use claim. You've obliterated a major function of the Hatch-Waxman Act. If I may have just another 30 seconds on this other matter regarding Judge Coates' decision. Judge Coates' decision is a perfect example of the paradigm that I have simply given you. Because Takeda could not bring drug product claims on the 584 and the 404, it could not bring drug product claims because those patents do not claim Actos itself, Actos alone. Takeda instead brought claims under the 584 and the 404 for the way that Actos might be used. The Judge Coates' situation is a perfect example of the dynamic where this is where Takeda had to go to court in order to get an injunction. It could not get an automatic stay or should not be allowed to get an automatic stay. You're saying that the litigation for Judge Coates was about the method of use patent in the sense of not the uniqueness of the chemical composition of Actos itself alone, but its relationship to the other ingredients for the other alternate uses that are listed in the other patents. Yes, Your Honor. You'll see that in two very specific places. If you look at the beginning of the decision, Judge Coates describes the 777, the 584, and the 404. She says the 777 covers the chemical compound, but the other two patents cover a combination of pioglitazone with other anti-diabetes agents. And then later in the decision, she repeatedly calls those two patents what she called the combination-use patents. So Judge Coates completely got what this was about. This is a method of use, method of use only. There should have been allowed to have carve-outs. If there are no questions, that's my opinion. Thank you. Thank you very much. We'll hear rebuttal. Thank you, Your Honor. I think I may address some of these points in reverse order. First of all, I encourage the Court to review Judge Coates' decision because I simply disagree with the way that it's been described. In fact, Mr. Sobel's reference to the combination-use naming convention that Judge Coates adopted is precisely the point. I'd encourage you to look at not only Judge Coates' decision, but the patents themselves. You can find the patents in the supplemental appendix at AA100 and AA117. What you'll see is that those patents contain both combination-product patents and method-of-use patents. The hyphen combination-use conflates the two, but the fact is that the patents contain both types of claims. This isn't an exercise in creativity or creative writing by the patent holder. The patent office decides what inventions are properly claimed within the patent. The fact is that these patents contain both types of claims. Judge Coates' decision did not limit her analysis to claims about infringement on a method-of-use. You won't see that in the opinion. You will see the reference to combination-use. Mr. Reed, I apologize. I don't know what's wrong with the sound. Let me ask you a question. I have a drug, drug X, and I patent it, and then the patent expires. Two years after the patent expires, I find a new way to use drug X with compounds A and B. I file a new patent on the combination of drug X with A and B. Someone starts to use a generic drug X. Do I have a claim under the new patent for infringement? The answer is potentially, Your Honor. Really? If it's a drug-product patent. Once it's expired, putting it to another use, which is creative, but as long after my intellectual property interest in it has expired, I can renew it. I can raise it like Lazarus from the dead. I can give it new life. Not exactly, Your Honor. Okay. We're talking about two different patents. The patent that you had that expired, you can't use again. Right. Anyone can use it. That's why I asked you specifically. When I now decide to use it with A and B, does someone infringing on that relationship between X and A and B bring within it the intellectual property I previously held as to X, or is X just generally known now and copyable? The intellectual property that you would be protecting, and it would be your right to protect, would be the intellectual property that is captured in the new patent. The question will be whether there is a reasonable claim of infringement of that patent. Not the former patent. That's not our position, Your Honor. The question is whether a claim of infringement of the new patent that has not expired could be asserted. That fits neatly within this construct. Again, I go back to the description my adversaries talk about. I think they're complaining a couple of things. They conceded that these patents needed to be listed. They were required to be listed. But then when Mr. Sobel talks about it, he talks about how they were allowed to be described. It's not how they're allowed to be described. We're not allowed to carve out claims from our own patents. We're required under the regulation, and I'd encourage the court to examine this regulation. It's 21 CFR 314.53C, which was in force. The same regulation was the same in 1999. Let me ask you, does a lawsuit involving some of these later uses of Actos after the Actos patent had expired, do lawsuits involving those combinations raise the legitimacy and or enforceability of the expired Actos patent? No. Okay, thank you. My point is that once you reach the conclusion that these patents had to be listed, which now plaintiffs have conceded, you need to look at the regulations to see how they're required to be described. And the regulations, I think, are unambiguous as well. And there's really no legitimate debate. You will see in those patents that there are both drug product patents, which include – and by the way, Mr. Sobel talked about the standard for me was just mentioned. Well, no, that's not the standard. Here, piclitazone is an essential active pharmaceutical ingredient in the combination patent. So that's not a low standard. I mean, if you've got that product, that substance, which is an essential ingredient in a drug product claim in the patent, and a reasonable claim of infringement could be asserted, Takeda absolutely reasonably concluded that it was required by law to list. The other point, this is in our briefs, and I know we didn't get to it, but there's the separate question about whether even if the court ultimately disagrees with our interpretation, plaintiffs have adequately pled a monopolization claim where they've not pled facts to suggest that Takeda's interpretation was anything but reasonable. I mean, if this argument and this appeal have demonstrated anything, it's that people will have different views about how to interpret this language. Takeda feels strongly that it interpreted it correctly, but it shouldn't be held liable or shouldn't be exposed to years of expensive antitrust litigation without some factual allegations to suggest that what they did was improper under the PepsiCo standard. And before you get to anti-competitive effects, and we cited the District of New Jersey decision that addressed that issue and concluded that, again, looking at a different aspect of the listing provision, that there were reasonable alternative interpretations. The defendant there acted consistent with one of those reasonable interpretations, and there the court properly granted the motion to dismiss. We respectfully submit that that is an inferred basis for the court to reverse and direct dismissal. Thank you. Thank you. Thank you, Mr. Reed. Thank you all. Very well argued and very well briefed. Helpful. Nicely done. Thank you all. Thank you.